IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CT-3238-FL

| | | |
|---|---|---|
| JOHNNIE D. ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REGGILLETTE ANDERSON,[1] | ) | |
| HUBERT PERSON, DR. GEORGE | ) | |
| SOLOMON, CAPTAIN COBB, MR. | ) | ORDER |
| SAULS, MR. HOWELL, MICHAEL | ) | |
| MILLS, DARLYN WHITE, WALTER | ) | |
| PENUEL, OFFICER GAY, ROBERT | ) | |
| VANDIFORD, CAPTAIN R. WATSON, | ) | |
| SARGENT NOBLE, ALVIN KELLER, | ) | |
| and DANNY SANFRIT, | ) | |
| | ) | |
| Defendants.[2] | ) | |
| | ) | |
| | ) | |

This matter is before the court on plaintiff's motion for summary judgment (DE 119),

defendants' motion for summary judgment (DE 126), and plaintiff's motion for representation at

mediation (DE 140). The issues raised have been fully briefed and are ripe for adjudication. For

---

[1] According to defendant Reggillette Anderson's affidavit, her first name is actually
"Reggielette." (App. Ex. 2 Roundtree Aff.). Also, defendant Reggillette Anderson's last name
has reverted back to her maiden name, Roundtree, and defendants now refer to her as
"Roundtree." (See Mem. Law (DE 129) at 2 n.2). At the time of the events in question,
however, her name was "Anderson." For ease of reference and to avoid any confusion, this court
will continue to refer to her as "Anderson."

[2] This court constructively has amended the caption of this order to reflect the dismissal
of two previously-named defendants: Robert C. Lewis and Estate of Lancelot Merritt. (See DE
69, 109).

the following reasons, this court grants defendants' motion and denies plaintiff's motions.

## STATEMENT OF THE CASE

On September 30, 2013, plaintiff, a state inmate, filed this civil rights action, pro se, pursuant to 42 U.S.C. § 1983 against defendants named as Officer Anderson ("Anderson"), Mr. Person ("Person"), Dr. George Solomon ("Dr. Solomon"), Captain Cobb ("Cobb"), Mr. Sauls ("Sauls"), Officer Merritt ("Merritt"), Mr. Howell ("Howell"), Mr. Mills ("Mills"), Darlyn White ("White"), Officer Gay ("Gay"), and Officer Penuel ("Penuel"). In his original verified complaint, plaintiff asserted that while incarcerated at Maury Correctional Institution ("Maury C.I."), he was subjected to excessive force and retaliation on three occasions in 2010. See Compl. (DE 1) ¶ V.

On May 14, 2014, this court conducted a frivolity review pursuant to 28 U.S.C. § 1915. At that time, this court noted that the alleged excessive force incidents occurred on March 31, 2010, April 6, 2010, and April 21, 2010. This court found that plaintiff's action was time barred because it was filed after the expiration of the three-year statute of limitations. This court further found that to the extent plaintiff had alleged prison officials failed to adequately respond to his grievances or protect him from assault, those claims were also time barred. This court noted that to the extent plaintiff was attempting to allege a claim arising out of his participation in the North Carolina Department of Public Safety's ("NCDPS") grievance procedure, the claim was meritless because there is no constitutional right to have available or to participate in a grievance process. Ultimately, on frivolity review, this court dismissed the action without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and directed the clerk to close the case.

Plaintiff appealed this court's May 14, 2014, ruling. Plaintiff also filed a motion to alter or amend this court's May 14, 2014, judgment pursuant to Federal Rule of Civil Procedure 59(e), a

motion to amend his complaint, and a "motion for stay of dismissal." This court granted plaintiff's

Rule 59(e) motion, and directed the clerk to re-instate this action on June 26, 2014.[3] This court also

granted plaintiff's motion to amend, and directed plaintiff to file his amended complaint within 14

days.

On July 16, 2014, plaintiff filed a verified amended complaint, in which he alleges that he

was subjected to excessive force on four occasions: March 31, 2010, April 6, 2010, April 21, 2010,

and June 4, 2010. (See Am. Compl. (DE 16)). Plaintiff further alleges that the April 6, 2010, April

21, 2010, and June 4, 2010, incidents were a form of retaliation against him for the March 31, 2010,

incident. (Id. at 7).

On September 18, 2014, this court conducted a frivolity review of plaintiff's amended

complaint. This court determined that it did not appear from the face of the complaint that plaintiff

was entitled to no relief, and therefore, the matter was allowed to proceed.

On March 30, 2015, plaintiff filed a motion for entry of default as to defendants Person,

Merritt, Penuel, and Gay. On April 10, 2015, a notice was filed pursuant to Federal Rule of Civil

Procedure 25(a)(3) advising this court that defendant Merritt died on May 28, 2011.

On May 4, 2015, plaintiff filed a motion for entry of default against defendant Lewis. On

June 5, 2015, this court granted in part and denied in part plaintiff's motion for entry of default

against defendants Person, Merritt, Penuel, and Gay. Plaintiff's motion for entry of default against

defendant Lewis was denied as moot, and plaintiff was given 14 days to show cause why defendant

Lewis should not be dismissed. Plaintiff failed to show cause, and defendant Lewis was terminated

---

[3] On July 24, 2014, plaintiff filed a motion to dismiss his appeal as moot. On July 29, 2014, the Fourth Circuit Court of Appeals granted the motion and dismissed plaintiff's appeal.

on September 8, 2015. On June 25, 2015, the clerk entered default against defendants Gay and Person. On August 31, 2015, former defendant Estate of Lancelot Merritt ("Merritt Estate") was substituted for former defendant Merritt.

On October 15, 2015, plaintiff filed a motion for summary judgment. On November 9, 2015, defendants Anderson, Cobb, Merritt Estate, Howell, Alvin Keller ("Keller"), Mills, Noble, Penuel, Sanfrit, Sauls, Dr. Solomon, Vandiford, R. Watson ("Watson"), and White filed a motion for judgment on the pleadings. On the same day, defendant Merritt Estate filed a motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6).[4] On January 11, 2016, plaintiff filed a motion for temporary restraining order/motion for preliminary injunction.

On January 21, 2016, this court denied plaintiff's motion for a temporary restraining order/motion for preliminary injunction. On June 23, 2016, this court denied as premature plaintiff's motion for summary judgment and granted the motion to dismiss filed by defendant Merritt Estate and dismissed it from this action. The motion for judgment on the pleadings was denied. On July 29, 2016, this court entered a case management order.

On August 10, 2016, plaintiff filed a motion for preclusion order and motion for judgment as a matter of law. On September 16, 2016, plaintiff filed a motion to stay. On September 22, 2016, this court denied plaintiff's motion for preclusion order, motion for judgment as a matter of law, and motion to stay.

On November 3, 2016, plaintiff filed the instant motion for summary judgment. In support of his motion, plaintiff relies upon his verified amended complaint (DE 16) and declaration (DE 119-

---

[4] In particular, defendant Merritt Estate argued that plaintiff failed to present his claims in the time allowed by N.C. Gen. Stat. § 28A-19-3.

1).  On November 17, 2016, defendants filed a response in opposition.

On March 3, 2017, defendants filed their motion for summary judgment.  In support of their motion, defendants filed a statement of material facts (DE 127) and an appendix to the statement of material facts (DE 128), which consists of the following: defendant Penuel's affidavit with exhibits (DE 128-1); defendant Anderson's affidavit with exhibits (DE 128-2); and Chineta Williams's ("Williams") affidavit with exhibits (DE 128-3), including video footage of certain portions of the April 21, 2010 and June 4, 2010, incidents.  On April 4, 2017, plaintiff filed a response in opposition to defendants' motion for summary judgment.

## STATEMENT OF THE FACTS

Except as otherwise noted below, the undisputed facts are as follows.  On March 24, 2010, defendant Anderson "wrote up" plaintiff for masturbating in front of her and a female nurse.[5]  (App. Ex. 2, Roundtree Aff. ¶¶ 7, 9, Ex. A).  Defendant Anderson initiated the paperwork for a disciplinary infraction.[6]  (Id. ¶ 6).

A.    March 31, 2010 incident

When defendant Anderson arrived at work on March 31, 2010, plaintiff complained to her about the disciplinary infraction he received for masturbating in front of her on March 24, 2010.[7]

---

[5] Plaintiff and defendant Anderson had prior interactions.  In particular, plaintiff frequently called defendant Anderson a "bitch" and told her she was ugly.  (App. Ex. 2, Roundtree Aff. ¶ 20).  Defendant Anderson had in the past accused plaintiff of unspecified disciplinary offenses.  (App. Ex. 3, Williams Aff. ¶ 16).

[6] An inmate is not actually charged with a disciplinary infraction without the approval of the Unit Manager.  (App. Ex. 2, Roundtree Aff. ¶ 6).

[7] An officer initiating paperwork for a disciplinary infraction is not precluded from supervising the housing area where the inmate is located after the charge has been filed.  (Id. ¶ 10).

(Id. ¶ 12). Plaintiff informed defendant Anderson that his behavior was directed toward the female nurse, not her. (Id.) Defendant Anderson advised plaintiff that he was properly written up for the infraction, regardless of which female he was directing his conduct. (Id.)

Later that day, at approximately 10:30 a.m., defendant Anderson was serving lunch trays to the housing block of the Red Unit Segregation B Block, which was where plaintiff was being housed. (Id. ¶ 13). On the segregation block, officers serve inmates their meals on a tray through an opening in the cell door referred to as a "trap door." (Id.) When defendant Anderson got to plaintiff, he accepted his lunch tray without incident. (Id.)

Defendant Anderson called plaintiff a "snitch."[8] (Am. Compl. (DE 16) at 3, 6; Pl.'s Decl. (DE 119-1) at 1). When defendant Anderson later went to plaintiff's cell door to retrieve his food tray, she unlocked the trap door, and plaintiff immediately stuck his arm out. (App. Ex. 2, Roundtree Aff. ¶ 14). Plaintiff had a milk carton in his hand, and he threw the contents of the carton on defendant Anderson. (App. Ex. 2, Roundtree Aff. ¶ 14; App. Ex. 3, Williams Aff. Ex. C; Am. Compl. (DE 16) at 3). Defendant Anderson was covered, from her head to her toes, in what she thought was spoiled milk and vegetables. (App. Ex. 2, Roundtree Aff. ¶ 14). Because defendant Anderson called plaintiff a "snitch," plaintiff felt he was left with no alternative but to throw milk on her for placing his life and well-being in danger. (Am. Compl. (DE 16) at 6). Despite orders to stop, plaintiff continued to swing his arm and the milk carton towards defendant Anderson. (App. Ex. 2 Roundtree Aff. ¶ 14).

Defendant Anderson drew her pepper spray. (Id.) Plaintiff then reached back inside his cell

---

[8] Plaintiff's claim that he was called a snitch was confirmed by "Oliver," an inmate who reported that he overheard defendant Anderson call plaintiff a "snitch" and then saw defendant Anderson with milk on her. (App. Ex. 3, Williams Aff. ¶ 17).

for another cup, and he proceeded to throw the contents of a second cup on defendant Anderson. (Id.) According to plaintiff, the whole incident could have been avoided, but plaintiff was essentially "pushed into a physical conflict." (Am. Compl. (DE 16) at 6). In particular, plaintiff believes the failure to respond to being called a "snitch" in prison could put an inmate at risk of being injured, raped, or even killed. (Id. at 7).

Following the second assault, defendant Anderson sprayed one two-second burst of pepper spray into plaintiff's cell to stop the assault. (App. Ex. 2, Roundtree Aff. ¶ 14; Am. Compl. (DE 16) at 3). Plaintiff put his arm back in the trap door, defendant Anderson locked the door, and she reported the incident to her supervisor, Sergeant Author. (App. Ex. Roundtree Aff. ¶ 14). Plaintiff was not injured. (App. Ex. 3, Williams Aff. ¶ 20). In fact, plaintiff joked with the nursing staff that defendant Anderson had "missed" him with the pepper spray. (Id.)

Defendant Anderson was sent for an outside medical evaluation because it was feared the assault had exposed her to bodily fluids. (Id. ¶¶ 15-16). Following the incident with defendant Anderson, plaintiff feared for his safety and requested a transfer to another prison. (Am. Compl. (DE 16) at 3).

During the early part of April 2010, plaintiff complained about the March 31, 2010, incident, and asked Williams to investigate the matter.[9] (App. Ex. 3, Williams Aff. ¶¶ 12-13). Initially, Williams interviewed defendant Anderson, took a statement, and determined that although defendant Anderson had reported the incident, for whatever reason, no investigation was initiated. (Id. ¶ 13). Williams also interviewed Officer Dixon, who corroborated defendant Anderson's statement

---

[9] At the time of the incidents involved in this lawsuit, in 2010, Williams was the correctional lieutenant at Maury C.I., which was the second-ranking officer who reported to the officer-in-charge.

regarding the incident and also indicated that he saw plaintiff throw liquids on defendant Anderson. (<u>Id.</u> ¶ 15).

Prison officials concluded that plaintiff's claims about defendant Anderson retaliating against him were meritless because he had been properly charged with the infraction. (<u>Id.</u> ¶ 18). Prison officials determined that there was no surveillance video of the March 24, 2010, incident, due to the position of the surveillance cameras. (<u>Id.</u> ¶ 21). Prison officials found that defendant Anderson responded appropriately to plaintiff throwing liquids on her, and the use of the pepper spray was "justified" to stop the assault. (<u>Id.</u> ¶ 19).

Plaintiff was charged with a disciplinary infraction related to the March 24, 2010, incident, and he was criminally prosecuted for the attack. (App. Ex. 2, Roundtree Aff. ¶¶ 17-18). Plaintiff was also "unlawfully" moved to Maximum Control ("M-Con"), which is a "hostile and dangerous place." (Pl.'s Decl. (DE 119-1) at 2; App. Ex. 2, Roundtree Aff. ¶ 21). Defendant Anderson saw plaintiff on one occasion after the incident, and he laughed and called her a "dumb butt bitch." (App. Ex. 2, Roundtree Aff. ¶ 22).

On April 10, 2010, Sergeant Washington informed plaintiff that she was doing an incident report for excessive force from the March 31, 2010, incident. (Pl.'s Decl (DE 119-1) at 3). Sergeant Washington came back on April 11, 2010, and advised plaintiff that she was the investigator for the March 31, 2010, incident, and the statement plaintiff gave the day before was done as a favor to Williams. (<u>Id.</u>)

On April 17, 2010, Sergeant Spruill called plaintiff out, and plaintiff sat for at least an hour in the hall's holding cell. (<u>Id.</u>) At around 11:30 a.m. that day, Sergeant Spruill showed up and told plaintiff that he was the investigator for the March 31, 2010, incident. (<u>Id.</u>) Sergeant Spruill stated

that he knew nothing about Sergeant Washington being the investigator, and he had no knowledge of plaintiff's original statements. (Id.) Sergeant Spruill refused to provide plaintiff with additional statement forms. (Id.)

On May 19, 2010, plaintiff was taken to a disciplinary hearing regarding the March 31, 2010, incident. (Id. at 7). During the middle of the hearing, former defendant Merritt barged into the room and stood over plaintiff in a threatening manner until plaintiff started "talking junk." (Id.) Plaintiff was agitated, and he was escorted out. (Id.) Plaintiff was ultimately found guilty of throwing fluid on an officer. (Id.) Plaintiff was also blamed for the interruption during the disciplinary hearing, as it was noted that he was removed from the hearing. (Id.)

B.    April 6, 2010 incident

On April 6, 2010, plaintiff's property was packed for no reason while he was at a sick call appointment. (Id. at 2). Plaintiff was told that his property would be held for 72 hours. (Id.) Plaintiff raised his voice "in protest" to this news about his property, and he was slammed to the ground, kneed in the back, and choked, which all happened while he was fully restrained.[10] (Pl.'s Decl. (DE 119-1) at 2; Am. Compl. (DE 16) at 3). Then, plaintiff was lifted off the ground by at least five additional officers who responded to the incident. (Pl.'s Decl. (DE 119-1) at 2). This

_____

[10] According to defendants, on April 6, 2010, plaintiff was being escorted by defendant Penuel, a correctional officer, and Officer Horne from the medical clinic back to the Gray Unit. (App. Ex. 1, Penuel Aff. ¶ 6). Defendant Penuel was conducting a "soft touch escort" of plaintiff, touching his right arm, when the group encountered defendant Mills in the hallway. (Id. ¶ 6). Plaintiff became aggressive, attempted to free himself from the officers' hold, and charged at defendant Mills. (Id.). Plaintiff was ordered to stop his resistance and assaultive behavior. (Id. ¶ 7). Defendant Penuel feared that plaintiff would assault defendant Mills, and in order to stop this from happening, Officer Horne and defendant Penuel placed plaintiff on the hallway floor and had another officer secure his legs. (Id.). Defendant Penuel contends that he did not hit or strike plaintiff, and he applied only the force that he felt was necessary to secure plaintiff and stop what he deemed to be an imminent assault. (Id. ¶ 8).

incident was an act of retaliation against plaintiff for the March 31, 2010, incident between him and defendant Anderson. (Am. Compl. (DE 16) at 7).

Plaintiff was taken before P.A. Jerry Legget in medical to be evaluated following the use of force. (Pl.'s Decl. (DE 119-1) at 2; App. Ex. 1, Penuel Aff. ¶ 10). Plaintiff was found to have sustained no injuries, and he was returned to his cell without further incident. (App. Ex. 1, Penuel Aff. ¶ 10)

The April 6, 2010, incident went unreported for 15 days, until April 23, 2010, when plaintiff reported it to defendant Mills of the M-Con Unit. (Pl.'s Decl. (DE 119-1) at 3). Defendant Mills advised him that there would be an investigation. (Id.)

Plaintiff submitted grievances, but he never heard anything. (Id. at 6). Then, on April 20, 2010, plaintiff was served with an infraction form. (Id. at 4). The next day, plaintiff went to a disciplinary hearing. (Id.)

On April 24, 2010, Sergeant Pelletier informed plaintiff that she had been tasked with doing an investigation of the April 6, 2010, incident. (Id. at 5). Sergeant Pelletier prepared an incident report regarding the events. (App. Ex. 3 Williams Aff. ¶ 25, Ex. D).

It was ultimately determined that the evidence did not support plaintiff's allegations that he was choked by defendant Penuel and held down by five officers. (Id.) The April 6, 2010 use of force was reviewed by facility management and found to be both "necessary and appropriate." (Id.)

C.    April 21, 2010 incident

On April 21, 2010, former defendant Merritt attempted to collect food trays from plaintiff's

cell, but plaintiff had placed his arm out of his trap door with his fist closed.[11] (App. Ex. 3, Williams Aff. ¶ 32, Ex. E). In response, plaintiff was "attacked" by former defendant Merritt. (Am. Compl. (DE 16) at 8). In particular, former defendant Merritt struck plaintiff with his baton, tried to "smash" plaintiff's arm in the trap door, and kicked his arm.[12] (App. Ex. 3, Williams Aff. ¶ 33, Ex. E; Am. Compl (DE 16) at 8).

Plaintiff called out to Officer Jones after the incident. (App. Ex. 3, Williams Aff. ¶ 34, Ex. E). Officer Jones came into the block because she had noticed former defendant Merritt with his baton out and cussing plaintiff. (Pl.'s Decl. (DE 119-1) at 5). Officer Jones saw blood on plaintiff's shirt and asked plaintiff what happened. (App. Ex. 3, Williams Aff. ¶ 34, Ex. E; Pl.'s Decl. 119-1 at 5). The Sergeant that was on duty, Sutton, reported that plaintiff had asked to talk to her on several occasions, but former defendant Merritt did not tell her that plaintiff asked for her again when he had his arm out of the trap door.[13] (App. Ex. 3, Williams Aff. ¶ 35, Ex. E.)

After the use of force screening by the charge nurse, it was feared that plaintiff's arm was broken or had a "fractured bone." (Am. Compl. (DE 16) at 8; Pl.'s Decl. (119-1) at 5). Plaintiff was

---

[11] Former defendant Merritt allegedly believed plaintiff might have had a weapon in his closed fist. (App. Ex. 3, Williams Aff. ¶ 32, Ex. E).

[12] According to defendants, former defendant Merritt feared for his safety and gave plaintiff orders to put his arm back into his cell and then tried to push plaintiff's arm back inside his cell. (Id.) Plaintiff refused to comply and pushed against the trap door to stop former defendant Merritt from closing it. (Id.) Former defendant Merritt struck plaintiff with his baton one time on the elbow, and former defendant Merritt immediately advised his supervisor about what had happened. (Id.)

[13] Defendants submitted a video recording of certain aspects of the April 21, 2010, incident. (Id. Ex. F.). The video has little evidentiary value because it only permits the court to discern a limited amount. (Id.) For example, the video shows plaintiff's arm hanging well outside of his cell. (Id.) The video then shows some sort of commotion taking place. (Id.) Finally, the video shows plaintiff casually walking away from his cell in no visibly apparent distress. (Id.)

taken to main medical and then to Pitt Memorial Hospital. (Pl.'s Decl. (DE 119-1) at 5; Am. Compl. (DE 16) at 8). Plaintiff was diagnosed with abrasions and contusions.[14] (Pl.'s Decl. (DE 119-1) at 5).

On May 10, 2010, plaintiff mailed copies of grievance number 4875-MC-10-072 to the proper parties, but the grievance went unacknowledged. (Id. at 6). In fact, the grievance was not received until after plaintiff had, once again, been brutally attacked, discriminated against, and denied due process, as alleged further below regarding the June 4, 2010, incident. (Id.)

Prison officials ultimately determined that former defendant Merritt did not act in compliance with policy requirements. (App. Ex. 3, Williams Aff. ¶ 36, Ex. F). In particular, prison officials found that because plaintiff did not pose an active threat to former defendant Merritt, plaintiff should have been handled with the passive resistance policy or by attempting to de-escalate the situation first. (Id. ¶ 36). Also, former defendant Merritt should have notified his supervisor of plaintiff's behavior before any force was used. (Id.) Discipline was initiated against former defendant Merritt as a result of this incident. (Id. ¶ 39, Ex. E).

D.    June 4, 2010 incident

On June 4, 2010, defendant Penuel was working on the Gray Unit. (App. Ex. 1, Penuel Aff. ¶ 13). Initially, defendant Penuel encountered plaintiff in the morning because plaintiff was kicking his cell door. (Id.) When defendant Penuel asked plaintiff why he was kicking his door, plaintiff responded that defendant Penuel was not supposed to be working on his housing block or otherwise be near him. (Id.) In an effort to avoid behavioral trouble from plaintiff, defendant Penuel switched posts with another officer. (Id. ¶¶ 13-14).

_____

[14] According to defendants, plaintiff did not suffer any injuries. (Id. ¶ 38).

Later that same day, defendant Penuel assisted defendant Gay with distributing lunch trays to the entire Gray Unit, which included plaintiff. (Id. ¶ 15). Plaintiff "eased" his arm out to hold the trap door so that defendant Gay would be required to call the Sergeant. (Pl.'s Decl. (DE 119-1) at 8; App. Ex. 3 Williams Aff. ¶ 46, Ex. G). Defendant Gay attacked plaintiff by yanking and pulling on his arm (Pl's Decl. (DE 119-1) at 8), and defendant Penuel pulled plaintiff's arm out of the cell even further (Am. Compl. (DE 16) at 9). Defendants Penuel and Gay next tried to wrestle plaintiff's arm back into the cell. (Pl.'s Decl. (DE 119-1) at 8). Defendant Penuel tried to pry plaintiff's fingers open to put something in his hand, and when that wouldn't work, defendant Penuel hit plaintiff's hand with his baton at least nine times. (Id.) Plaintiff asked defendant Penuel why he was hitting plaintiff. (Id.) Defendant Penuel then tried to "spray" plaintiff, but missed, and he started beating plaintiff's arm again. (Id.) Defendants Gay and Penuel "victimized and brutalized" plaintiff.[15] (Am. Compl. (DE 16) at 8).

---

[15] According to defendants, defendant Gay went to plaintiff's cell to give him lunch while defendant Penuel was elsewhere on the housing block. (App. Ex. 1, Penuel Aff. ¶ 16). Defendant Penuel heard defendant Gay call out for help, explaining that plaintiff had a hold of his shirt from the trap door. (Id.) Defendant Penuel went to plaintiff's cell and saw that plaintiff had defendant Gay by the shirt. (Id. ¶ 18). Defendant Penuel feared plaintiff might have had a metal object in his hand, such as a file or nail clippers, that he was attempting to stab defendant Gay with. (Id.)

Defendant Penuel ordered plaintiff to let go of defendant Gay and put his arm back inside his cell. (Id, ¶ 19). Plaintiff refused to comply. (Id.) Because defendant Penuel thought plaintiff had a weapon and he and defendant Gay were under threat of an assault (in particular a stabbing), defendant Penuel deployed one burst of pepper spray into the trap door. (Id. ¶¶ 19-20). The pepper spray did not seem to be effective because plaintiff refused to return his arm to his cell. (Id. ¶ 21). Plaintiff continued to swipe and grab at defendants Penuel and Gay, and they tried to push his arm away. (Id. ). Defendant Penuel struck plaintiff's hand one time to stop him. (Id.).

Defendant Penuel immediately reported the use of force to his sergeant. (Id. ¶ 22). Defendant Gay reported that plaintiff had put his arm outside the trap door, and he tried to push plaintiff's arm back into the cell. (App. Ex. 3, Williams Aff. ¶ 44, Ex. G). Defendant Gay further reported that plaintiff laughed and said, "You're gonna have to do more than that." (Id.)

Plaintiff alleges he broke his hand during the incident. (App. Ex. 3, Williams Aff. ¶ 46, Ex. G). Plaintiff was not sent out to see a doctor at the time, and he did not see a doctor for 51 days. (Pl.'s Decl. (DE 119-1) at 9). Plaintiff was treated solely with ice packs and Ibuprofen.[16] (Id.).

Williams reviewed the video footage of the incident and included it with her report on the incident.[17] (App. Ex. 3, Williams Aff. ¶ 47, Ex. H). Williams, once again, concluded that prison staff should have followed the passive resistance policy and notified their supervisor before using force against plaintiff. (Id. ¶ 48). Facility management initiated discipline against both defendants Penuel and Gay. (Id. ¶¶ 48, 50).

On September 20, 2010, plaintiff was transferred to Scotland Correctional Institution. (Pl.'s Decl. (DE 119-1) at 17). Plaintiff was immediately classified as M-Con, and he was, once again, placed in the M-Con section of the prison. (Id.)

## DISCUSSION

A.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district

_____

[16] Medical staff reported that plaintiff was treated with an ice pack and Ibuprofen because he did not suffer any injuries. (App. Ex. 3, Williams Aff. ¶ 49).

[17] Defendants submitted a video of certain aspects of the June 4, 2010, incident. (See App. Ex. 3 Williams Aff. Ex. H). The video has little evidentiary value because it is of low quality and permits the court to discern very little. The June 4, 2010, video does show plaintiff's arm hanging almost completely out of his cell and an officer in front of plaintiff's cell who appears to be struggling. (Id.) Then, a second officer, standing nearby, comes to assist the first officer. (Id.) At the end of the video, plaintiff is seen coming out of his cell, on his own accord, and in no obvious distress. (Id.)

court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based

on speculation and conjecture." <u>Myrick v. Prime Ins. Syndicate, Inc.</u>, 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. <u>Id.</u> at 489-90.

B.      Analysis

1.      Plaintiff's Motion for Summary Judgment

Plaintiff has failed to meet his burden of informing this court of the basis for his motion and identifying those portions of the evidence and record that he believes demonstrate there is no genuine issue of material fact. For example, plaintiff has failed to point to admissible evidence that demonstrates the essential elements of his claims. Rather, plaintiff relies on his own bare assertions. In sum, plaintiff has failed to show there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Consequently, plaintiff's motion for summary judgment must be DENIED.

2.      Defendants' Motion for Summary Judgment

In their motion for summary judgment, defendants contend that there is no genuine issue of material fact that the remaining named defendants committed acts constituting excessive force during the March 31, 2010, April 6, 2010, April 21, 2010, and June 4, 2010, incidents. Defendants further contend that the surveillance video footage precludes a finding that they committed a constitutional violation, and qualified immunity bars plaintiff's claims against them. Defendants conclude that because plaintiff has not and cannot present sufficient evidence to permit reasonable jurors to find in his favor, all of plaintiff's claims against them should be dismissed.

a.      Excessive force claims

Plaintiff alleges that defendant Anderson used excessive force on him on March 31, 2010, and defendant Penuel used excessive force on him on April 6, 2010. (See Am. Compl. (DE 16) at 3). Plaintiff further alleges that defendant Mills "authorized" the April 6, 2010 use of excessive force. (Id. at 7). Finally, plaintiff alleges that he was subjected to excessive force on four separate occasions: March 31, 2010, April 6, 2010, April 21, 2010, and June 4, 2010. (Id. at 6-9).

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. To establish an Eighth Amendment claim, an inmate must satisfy both a subjective component and an objective component. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). The subjective component requires a showing that the prison official acted with a sufficiently culpable state of mind, and the objective component requires a showing that the deprivation suffered or the harm inflicted was sufficiently serious. Id.

A claim of excessive force by a correctional officer against an inmate is evaluated as a possible violation of the Eighth Amendment's prohibition against cruel and unusual punishments. Whitley v. Albers, 475 U.S. 312, 319 (1986); Hudson v. McMillian, 503 U.S. 1, 5-7 (1992). A correctional officer violates the Eighth Amendment when he applies "unnecessary and wanton infliction of pain." Hudson, 503 U.S. at 5. When determining whether the force applied by prison officials was excessive, the court must determine if the "force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. at 6-7 (citation omitted). In making this determination, courts look at the following: (i) the need for force, (ii) the relationship between the need for force and the amount of force actually applied, (iii) the threat is reasonably perceived by prison officials, and (iv) whether efforts were made to

temper the severity of the force used. <u>Whitley</u>, 475 U.S. at 320 (the "<u>Whitley</u> factors"). The

<u>Whitley</u> Court noted:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used.

<u>Id.</u>

In addition to demonstrating that the correctional officer acted "maliciously and sadistically," an inmate raising an excessive force claim must also show that the officer used a "nontrivial" amount of force. <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 39 (2010). While an inmate must show nontrivial force, an Eighth Amendment violation need not cause a serious injury. <u>Id.</u> at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").[18]

As a preliminary matter, one of the alleged incidents of excessive force, the April 21, 2010, incident, involved the exercise of force only by <u>former</u> defendant Merritt. (<u>See</u> Am. Compl. (DE 16) at 8; Pl.'s Decl. (DE 119-1) at 4). Therefore, summary judgment is warranted for the remaining defendants because they were not involved with the alleged excessive force on April 21, 2010.

This court will apply the <u>Whitley</u> factors to each of three remaining incidents of alleged excessive force in turn.

i. March 31, 2010 incident

Plaintiff's first incident of alleged excessive force occurred on March 31, 2010. With respect

---

[18] The Fourth Circuit Court of Appeals has defined the term "force" as "power, violence, or pressure directed against a person or thing." <u>Bejarano-Urrutia v. Gonzales</u>, 413 F.3d 444, 450 (4th Cir. 2005) (citation and alteration omitted).

to the first <u>Whitley</u> factor, this court must assess the need for force. On March 31, 2010, it is undisputed that plaintiff engaged in two instances of assaultive behavior, and during each assault he threw unknown contents on defendant Anderson. (App. Ex. 2, Roundtree Aff. ¶ 14). Plaintiff was ordered to stop his assaultive behavior, but he refused to comply. (<u>Id.</u>) Defendant Anderson arguably could have walked away and ignored the assaults, but there was a need to maintain order. There was also a need to stop plaintiff's non-compliant and assaultive behavior. Therefore, this first factor weighs in defendants' favor.

As for the second factor, this court must look at the relationship between the need for force and the amount of force applied. The force applied on March 31, 2010 consisted of defendant Anderson spraying plaintiff with <u>one</u> two-second burst of pepper spray after plaintiff committed <u>two</u> assaults. The short burst of pepper spray was no greater than necessary to get plaintiff to put his arm back in the trap door and restore order. Consequently, this second factor weighs in defendants' favor. <u>See</u> <u>Williams</u>, 77 F.3d at 763 (noting that mace can constitutionally be used in small quantities to control a disobedient inmate).

Under the third factor, this court must look at the threat as reasonably perceived by prison officials. Here, the threat created by plaintiff's assaults included a threat to defendant Anderson's safety by being covered in unknown contents. There was also a general need to maintain order. Thus, this third factor weighs in defendants' favor.

Finally, under the fourth <u>Whitley</u> factor, this court must determine whether efforts were made to temper the force employed. The force, <u>one</u> two-second burst of pepper spray, came only after plaintiff had been ordered to stop his assaultive behavior, he failed to comply, and he committed <u>two</u> assaults on a prison guard. (App. Ex. 2, Roundtree Aff. ¶ 14). The short burst of pepper spray was

sufficient but not greater than necessary to get plaintiff comply with the direct orders from a prison guard to put his arm back in the trap door.  (Id.)  This final factor weighs in defendants' favor.

In sum, the Whitley factors regarding the March 31, 2010, incident weigh dispositively in defendants' favor.

### ii.  April 6, 2010 incident

The second alleged incidence of excessive force occurred on April 6, 2010.  Under the first Whitley factor, this court must evaluate the need for force.  With respect to the April 6, 2010, incident, it is undisputed that plaintiff saw an unnamed prison official in the main hall and asked about his emergency grievance.  (See Pl.'s Decl. (DE 119-1) at 2).  The prison official told plaintiff that he needed to calm down.  (Id.)  Plaintiff then raised his voice "in protest" to the news that his property would be held for 72 hours.  (Id. at 2, 7).  In response, plaintiff alleges he was slammed to the ground, kneed in the back, and choked, which occurred while he was fully restrained.  (Id. at 2; Am. Compl. (DE 16) at 3).  Plaintiff further alleges that he was then lifted off the ground by at least five additional officers who responded to the incident.  (Pl.'s Decl. (DE 119-1) at 2).  Plaintiff's raised voice after he had been directed to calm down signaled a potentially volatile situation, and in a prison setting certainly warranted a need for force.  Therefore, this first factor weighs in defendants' favor.

With respect to the second factor, this court must look at the relationship between the need for force and the amount of force applied.  While there was a need to use some force to stop and regain control of plaintiff and to terminate a potentially volatile situation, the force applied was greater than necessary.  Accordingly, this second factor weighs somewhat more in favor of plaintiff.

As for the third factor, this court must look at the threat reasonably perceived by prison

officials. According to defendants, defendant Penuel was conducting a "soft touch escort" of plaintiff when the group encountered defendant Mills. (App. Ex. 1, Penuel Aff. ¶ 6). Plaintiff responded by becoming aggressive. (Id.) Defendant Penuel feared an imminent assault to defendant Mills, and in an effort to prevent this, Officer Horne and defendant Penuel applied force to plaintiff. (Id.) Defendant Penuel reasonably judged that the situation presented an imminent assault. Consequently, this third factor weighs in favor of defendants.

Finally, as for the fourth Whitley factor, this court must determine whether efforts were made to temper the force employed. The undisputed evidence does not reflect any efforts to temper the force employed. Thus, the fourth factor weighs in favor of plaintiff.

In sum, the Whitley factors are mixed. However, it is undisputed that following the incident on April 6, 2010, plaintiff was successfully screened and determined to have no evidence of trauma or injuries. (App. Ex. 3, Williams Aff., Ex. D). Accordingly, in light of the medical evidence from the April 6, 2010, incident of alleged excessive force, plaintiff has failed to demonstrate a genuine issue of material fact regarding whether defendants used a "nontrivial" amount of force. In light of the foregoing, plaintiff has failed to establish an Eighth Amendment violation with respect to the April 6, 2010, incident.

iii. June 4, 2010 incident

The fourth incident of alleged excessive force took place on June 4, 2010. Under the first Whitley factor, this court must determine the need for force. In this case, plaintiff alleges that he merely "eased" his arm out the door to hold the trap door of his segregation cell so that defendant Gay would be required to call the Sergeant. (Pl.'s Decl. (DE 119-1) at 8; App. Ex. 3 Williams Aff. ¶ 46, Ex. G). Although plaintiff's arm could have been ignored, there was a need for force so as to

maintain order on the segregation unit. According to defendants, plaintiff had a grasp on defendant Gay's shirt and posed a legitimate risk of imminent harm to defendant Gay. (App. Ex. 1, Penuel Aff. ¶ 16). This account is supported by the video, which shows an officer in apparent distress in front of cell and a second officer coming to his aid. (See App. Ex. Williams Aff. Ex. H). Therefore, the first factor weighs in defendants' favor.

With respect to the second factor, this court must look at the relationship between the need for force and the amount of force applied. According to plaintiff, defendant Gay attacked him by yanking and pulling on his arm. (Pl.'s Decl. (DE 119-1) at 8). Also, defendant Penuel pulled plaintiff's arm out of the cell even further. (Am. Compl. (DE 16) at 9). Defendant Penuel tried to pry plaintiff's fingers open to put something in his hand, and when that didn't work, he hit plaintiff's hand with his baton at least nine times. (Pl.'s Decl. (DE 119-1) at 8). The force applied, as alleged by plaintiff, was greater than the actual need. Thus, the second factor weighs in favor of plaintiff.

As for the third Whitley factor, this court must look at the threat reasonably perceived by prison officials. According to defendants, they perceived that plaintiff had a grasp on defendant Gay's shirt, which posed a genuine risk of imminent harm to defendant Gay. (App. Ex. 1, Penuel Aff. ¶ 16). This account is supported by the video, which shows an officer in apparent distress in front of cell and a second officer coming to his assistance. (See App. Ex. Williams Aff. Ex. H). Moreover, defendant Penuel reasonably feared that plaintiff might have a metal object and be attempting to stab defendant Gay. (Id. ¶ 18). Accordingly, this third factor weighs in favor of defendants.

With the fourth and final factor, this court must determine whether efforts were made to temper the force employed. Here, based on the undisputed evidence, defendants Gay and Penuel

did not make efforts to temper the force they applied. Thus, the final <u>Whitley</u> factor weighs in favor of plaintiff.[19]

In sum, considering the factors together, the evidence does not permit an inference that "force was applied . . . maliciously and sadistically for the very purpose of causing harm." <u>Hudson</u>, 503 U.S. at 5. In addition, following the incident on June 4, 2010, plaintiff was medically screened, and it was noted that his right hand was swollen. (App. Ex. 3, Williams Aff., Ex. G). Plaintiff was given an ice pack and Ibuprofen. <u>Id.</u> In light of this evidence, plaintiff has failed to demonstrate a genuine issue of material fact regarding whether defendants used a "nontrivial" amount of force.

Based on the foregoing, plaintiff has failed to establish an Eighth Amendment violation. In addition, given that the <u>Whitley</u> factors are at best mixed, and given that plaintiff has not demonstrated more than minor injuries, defendants are entitled to qualified immunity on plaintiff's Eighth Amendment claims. <u>See</u> <u>Wilkins</u>, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim."); <u>see e.g.</u>, <u>Williams v. Scott</u>, 433 F. App'x 801, 804 (11th Cir. 2011) (concluding that the minor nature of plaintiff's injuries–neck pain and continuous headaches–was inconsistent with a finding of malicious and sadistic intent). Accordingly, defendants' motion for summary judgment with respect to defendants Anderson, Penuel, and Mills is GRANTED.

b. Retaliation claims

Plaintiff alleges that defendants Mills, Vandiford, and Cobb retaliated against him because

---

[19] As addressed above, with respect to the April 21, 2010 and June 4, 2010, incidents, prison officials determined that defendants Gay and Penuel, and former defendant Merritt violated prison policy because they should have followed the passive resistance policy prior to using force. This court recognizes that prison policy best practices do not necessarily amount to an Eighth Amendment violation.

he filed a lawsuit against prison staff.  (See Am. Compl. (DE 16) at 3, 13).  Plaintiff argues that these actions constitute a violation of his First Amendment rights.  (Id.)

A claim of retaliation is treated with skepticism in the prison context.  Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) (noting that "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prison misconduct.") (citation omitted).  For an inmate to state a colorable claim of retaliation, the alleged retaliatory action must have been taken with regard to the exercise of some constitutionally protected right, or the retaliatory action itself must violate such a right.  Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). A plaintiff must allege specific facts supporting the claim of retaliation because bare assertions of retaliation do not establish a claim of constitutional dimension. Id. at 74-75.  Mere "temporal proximity" between the inmate's protected activity and the official's allegedly retaliatory act "is simply too slender a reed on which to rest" a retaliation claim.  Wagner v. Wheller, 13 F.3d 86, 90-91 (4th Cir. 1993) (requiring plaintiff to show "a causal relationship between the protected expression and the retaliatory action").

In this case, plaintiff alleges that defendants Mills, Vandiford, and Cobb retaliated against him.  Plaintiff, however, has provided no evidence that these defendants acted in retaliation because he filed a lawsuit, and plaintiff's speculative allegations of retaliation are insufficient to state a constitutional violation.  Thus, there is no constitutional violation, and these defendants are entitled to qualified immunity for these claims.  See Gregg v. Ham, 678 F.3d 333, 341 n.7 (4th Cir. 2012) ("To prevail under qualified immunity, [defendant] has to show either that there was no constitutional violation or that the right was not clearly established.").  Defendants Mills, Vandiford, and Cobb are entitled to summary judgment on plaintiff's retaliation claims.

c. Remaining non-defaulted defendants

Plaintiff has named Dr. Solomon, Sauls, Howell, White, Watson, Noble, Keller, and Sanfrit as defendants. These defendants are also entitled to summary judgment because plaintiff has not alleged any specific facts tending to establish excessive force, tacit authorization, or any personal involvement whatsoever by these defendants. See Monell v. Dep't of Soc. Servs. , 436 U.S. 658, 694 n.58 (1978) (holding that respondeat superior liability is unavailable under § 1983). Even if plaintiff alleged supervisory liability claims against these defendants, plaintiff would still not be entitled to relief because there is no underlying constitutional violation. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (setting forth the requirements to properly assert a supervisory liability claim under § 1983). Therefore, defendants' motion for summary judgment as to plaintiff's claims against defendants Dr. Solomon, Sauls, Howell, White, Watson, Noble, Keller, and Sanfrit is GRANTED.

d. Defaulted defendants

As noted, default was entered against defendants Person and Gay on June 25, 2015. Pursuant to Federal Rule of Civil Procedure 56(f)(1), the parties are given notice that this court intends to grant summary judgment in favor of the defaulting defendants for the same reasons defendants are entitled to summary judgment. See U. S. for Use of Hudson v. Peerless Ins. Co., 374 F.2d 942, 945 (4th Cir. 1967) ("Where the liability is joint and several or closely interrelated and a defending party establishes that plaintiff has no cause of action or present right of recovery, this defense generally inures also to the benefit of a defaulting defendant."). The parties shall have 14 days from the date of this order to show cause why summary judgment should not be granted for the same reasons as defendants discussed herein. If no response is received within the time allotted, defendants Person

25

and Gay are also entitled to summary judgment in their favor, and the clerk shall close this case without further order of the court.

      3.      Plaintiff's Motion for Representation at Mediation

In the third and final motion before this court, plaintiff appears to be requesting that his case be scheduled for a settlement conference. The motions presently before this court resolve all issues in dispute, except as to default judgment for defendants Gay and Person. Therefore, plaintiff's motion for representation at mediation is DENIED.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (DE 126) is GRANTED, plaintiff's motion for summary judgment (DE 119) is DENIED, and plaintiff's motion for representation at mediation (DE 140) is DENIED. The court DIRECTS the parties to show cause within 14 days of the date of this order why summary judgment should not be granted against defaulting defendants Person and Gay for the same reasons as defendants discussed herein. If no response is received within the time allotted, defendants Person and Gay are also entitled to summary judgment in their favor, and the clerk is DIRECTED to close this case without further order of the court.

SO ORDERED, this the 18th day of September, 2017.


                                    _____
                                      LOUISE W. FLANAGAN
                                   United States District Judge